Thank you very much, Your Honor. Good morning. May it please the Court, Ben Wiesinger, Petitioner, Mohammed Altayar. With all due respect, I'd like to flip the script a little bit and ask you, the Court, a question. Why do we continue to care about crimes involving moral turpitude? Why continue to use it? It's kind of an antiquated idea. I submit to you that it is because it is a indicator of future behavior, that when you find somebody with a vicious motive and a corrupt mind, nothing short of electroshock therapy is going to change that person's mind over the course of his lifetime. I wouldn't go that far. Well, we could train it out of people. Yes, I suppose so, Judge. But people make mistakes when they're young and do terrible things, but it doesn't mean they're going to be terrible people forever unless they go through electroshock therapy. But let's talk about your guy. Yes, please. Because you didn't represent him in the criminal case. No, I did not. He had very, very poor representation in that criminal case where the lawyer allowed him to plead guilty to an offense that then becomes something where it he was a despicable person when he's not a despicable person. And what you're asking us is to look behind the actual crime of conviction and look at the reality of the situation here. And shouldn't we be able to do that? Yes, that's exactly what I'm asking you to do. So tell us how we do it. You follow the examples I laid out in my brief of Judge Pragerson, God rest his soul, Judge Bea. We all want Judge Kaczynski, his famous peek at the Shepard document. I forget the case that's actually in it. Are you asking us not to apply the modified categorical approach here to this question of the moral turpitude provision? I'm saying two things, Your Honor. One, even applying the categorical approach, we still win. But no, I'm saying that the categorical approach only applies when there's two statutes to compare. There's no two statutes to compare here. First of all, there's no state crime involving moral turpitude and no federal crime involving moral turpitude. It's judge-made. It's common law. I guess the question then is, as a three-judge panel, how do we have the ability to credit, give life to that position? Because it does seem the court has applied the modified categorical approach and has said that it should apply to this provision in several cases. Navarro-Lopez provides us with the opening. The court went en banc and there were a number of different opinions, concurrences, dissents in that case. I think the en banc court needs to this up again and it needs to go to the Supreme Court, honestly. I don't believe that ever since Jordan v. DeGeorge, there's been a Supreme Court case that says, yes, the categorical analysis is appropriate for CIMTs because, obviously, the categorical analysis did not exist at that time, Jordan v. DeGeorge back in 1951, I believe. So that is exactly what I'm asking the court to do because you cannot judge moral blameworthiness in a vacuum just by comparing statutes. It's not possible and it's not fair to either side. I mean, for example, when we're looking at Judge DeGeorge, he even says, well, not all fraud offenses are the same, right? And he gives the example of the welfare mother versus the guy who defrauds employees of ERISA benefits. They're both fraud, but two very different families of it. And the only way you can know... You know, counsel, I'm having some difficulty following you. You say it's not fair. Right. Well, we don't judge on what we think is fair or unfair. We follow the law. We have to have a case. So whether I think it's fair or not doesn't seem to me to be what part of the... what I'm supposed to be doing as a judge. Do you have some case that says we can use that as a method of reversing? Your Honor... That I individually, because of experiences I've had, that I think it's fair. Person next to me perhaps says, no, it's fair. Isn't it the law? We have to look at the case law. And if so, what's your best case for the point you're making? Navarro-Lopez, Your Honor. Okay. Judge Bragerson and Judge Bea, in the same case, both say the same thing, that we should look at the entirety of the circumstances to determine whether somebody is truly morally blameworthy, vile, based, depraved, etc. I think you have to agree that the law of this circuit as it currently stands is that we don't do that. We apply the modified categorical approach. And you have certainly preserved the argument that you're making that you don't agree with that. But isn't that the law of the circuit as it stands today? It's mushy, Judge Brass. It really is. Because... I'm looking at the case, which was one of the cases you cited, which was Fernandez-Ruiz, and this is one of many, that says we may not look beyond the record of conviction itself to the particular facts underlying that conviction. And that's a case you rely upon. So, I guess I'd like to hear from... I understand your argument that you don't think the modified categorical approach should apply. I understand that other judges have expressed that view. But I think we do need to hear from you as to how, under that framework, you think your client's entitled to relief. Under the modified? Correct. Okay. The problem here is we have an unclear record of conviction. We have a reckless mens rea mentioned a dozen different... Well, maybe not a dozen different times, but a reckless mens rea found by the IHA in various parts of the plea colloquy. And yet, as my colleague points out, and the board pointed out, placing somebody in reasonable apprehension of physical injury would seem to, quote, track with A2, which requires an intentional act. So, was it reckless or was it intentional? I would submit to the court that the record is simply unclear. And when the record is unclear as to a grounds of removability, that the government does not meet its burden of proof. Why do you think it's unclear? I mean, you had charging documents that specifically used the language of 1203A2. You had a plea agreement that then pled guilty to that same count. And then you have a plea colloquy which, but for the use of the word recklessly, I think at one or maybe two points, otherwise track the language of 1203A2. So, why wouldn't we say that looking at the documents that we're allowed to look at under the modified categorical approach that it was a conviction under 1203A2 and 1204A2? Because of the reckless mens rea, which was agreed to by the trial court, by the trier of fact. No, it wasn't agreed to. It was used by his defense counsel inappropriately. But the charging document speaks for itself. I think you have to lose on that ground. And I say that as the trial judge who was reversed by the Ninth Circuit, because I found that murder was a crime of violence. How dare you, Judge? Because the categorical approach, there was some hypothetical way that you could commit murder in the state of Washington through mere negligence. When I resentenced Mr. Federoff, I asked him what he, about that. And he said, when my public defender called and told me we won in the Ninth Circuit, murder is not a crime of violence. I said to him, that's stupid. I said, thanks, Mr. Federoff, but that's the law. And even the public defender said, when I told my wife I won and how I won, she said, that's ridiculous. But anyway, we're stuck with that as the law. But on the particularly serious crime analysis, there we do have these frantescu factors, and maybe those were not really considered appropriately by the board here. And so if we don't get to go behind the record on the CIMT issue, we definitely have to on the PSC issue. And the board and the IJ just utterly failed to apply all those factors. Thank you, Your Honor, for throwing me that softball. Neither the IJ nor the BIA in the PSC analysis considered the fact that my client was the first victim of an assault. That in and of itself requires remand under any circumstances. I want to look at Delgado versus Holder, a case my colleague and I both cite. Delgado was driving while intoxicated. His third time. He had already been convicted twice for DUIs, right? And he wasn't even convicted this third time when he went before the IJ and requested asylum, withholding, and cat. And so there wasn't even a third conviction on his record. They just knew that he was driving intoxicated. So here we have the past conduct coming into play in the PSC analysis. Here, I want to remind the court of who my client is, okay? He is somebody who was, his house was shot up. He was shot at. His father's building was burned to the ground in Iraq. He could have become some, you know, disenfranchised dissident and joined ISIS. No. What did he join? The Red Crescent. He joined a humanitarian organization. And I want to remind the court of what happened about two weeks before the incident of the day in question that landed us all here on March 29, 2014. Somebody came into his store and threatened him with a gun. Now, did my client pull out a gun? No. He kept it down here. He didn't show it. He kept it down here. We've read the record. Yes. We understand the facts. How does it apply to the law? Because Delgado instructs us that part of the PSC analysis is looking at past actions, okay? And neither the IAJ nor the board did that. And so I... And the dangerousness analysis was dangerous at the scene of the crime, not dangerous going forward. And I think when you look at the fact that this guideline range was three to five years, and he was given a 48-hour sentence, there was an indication, and he did well on probation, that he's not a future danger... That's correct. ...to the community. And I don't know that that was considered. No. The IAJ and the BIA's decision were all focused on the present. They were all focused solely on the nature of the offense. And if dangerousness or the potential for dangerousness is the only aspect of a PSC, then all the rest of the stuff gets swallowed up. The board and the IAJ clearly erred in failing to take into consideration all the other facts and circumstances. So, Judge Wallace, do you have any other questions? Yes. What's your best case that we've decided, or any federal court appellate case, that your analysis is one that we should follow? I didn't find one. Maybe you have one. On the PSC analysis? Your best case. On the particularly serious crime analysis. Maybe Delgado. Absolutely. Yes. And also, the more recent one I cited in my 28-day letter, Flores-Vega. You want to save a little bit for rebuttal? Unless Judge Wallace has another question to follow up. Thank you. Okay. Thank you. Good morning, Your Honors, and may it please the Court. Attorney Sabatino F. Leo on behalf of the United States Attorney General. Gentlemen, we are a nation of laws and not of men. And it is clear that in this circuit, the application of the modified categorical approach is good law. And that stems back from Taylor v. United States, Shepard v. United States, and most recently, in Mathis v. United States, with regard to the Supreme Court decision specifically pertaining to the modified categorical approach. And indeed, as this panel has just indicated, Fernando Ruiz speaks unequivocally with regard to the modified categorical approach, as well as a number of cases that have been cited by respondent in respondent's brief to this court. But let us take that even a step further. There was no dispute in regard to divisibility in this particular case, and that the modified categorical approach would apply in this particular circumstance. And as a result, because we are applying the modified categorical approach, as those cases render, as well as this circuit court has consistently rendered, we are now allowed to look at a specific certain set of documents, not everything, a specific certain set of documents to ascertain what, in fact, the defendant had been convicted of in state court or federal court. And I plead with this court is that that is exactly what the agency did here with regard to the finding of crime involving moral torpitude. And I would invite this court's attention to not only to the plea colloquy, but also to the charge sheet. All can be found that the administrative record of 1216 to 1218, to 1235 to 1237, and to 1243 to 1260, that that's specifically the determination by the agency relying on those documents that they're lawfully allowed to rely upon found unequivocally that petitioner was convicted of aggravated assault in the Arizona state court. And that aggravated assault was committed with intent. And I would also invite this court's attention to 13-1203 in and of itself, A, B, and C. What is specific here is that he could not have pled to anything else. He would have had an improvident plea had there been a recklessness issue, which is why a trial judge here is smart, and that trial judge was smart here in understanding the very nature here when counsel for the defendant mentioned recklessness twice or three times. If the trial judge is so smart, why don't we ask the trial judge, did you consider this a particularly serious crime or a crime of moral torpitude? Why can't we? I've been a trial judge for 30 years, and I can tell you people come in all different ways. I've been a trial judge for 30 years, and I can tell you people come in all different ways. This little framework that the modified categorical approach gives us denies the humanity of who we're dealing with here. Why can't we look at Mohammed Mustafa Al-Tayyar as a person who might have made a mistake, but give me the context of it. Somebody molests a woman right in front of him, punches him in the face, and then he takes steps to try to apprehend that person, including drawing a gun that he has an absolute right to have and pointing it at the people when they are more than just the person who molested the woman and hit him, but the friends too, and hold them there until the police arrive. Why can't we think about the fact that the trial judge found no dangerousness, that the sentence was probation and 48 hours in jail, and take a look at this as a real human being? Well, I think there's a duality to your question there, Your Honor. I think there's the crime involving moral torpitude aspect, and then the particular serious crime aspect. That's what I'm talking about. Okay, so if we're now, because you specifically, the Supreme Court has said time and time again, cannot look behind these documents. Yeah, I don't think it's good law, but it's law. It is the law. It's the law of this land, Your Honor, and I understand your frustration as a trial judge. I will also, and then I'll speak to the particular serious crime issue here, in particularly, Frantescu and the Frantescu factors, but I think before we even get there, I think this court needs to recognize, or I would invite this court to recognize what its standard of review is, and its standard of review is abuse of discretion when considering, and that's under CONU versus United States, and that's cited in our brief, I believe on page 25 of our brief, that says this court is not inclined or may not reweigh the evidence. The court is only here to make a determination if the proper factors or the proper evidence was looked at, and I would like, I would take a little bit of a, you know, just a query or an issue with regard to there was no discussion, there was no inquiry into both dangerousness or the fact that he was an alleged victim here. I think number one, self-defense was on the table, which his defense counsel before the trial court said that is not a viable defense and took it off, so I would ask us to take that off the table as the trial court and defense counsel did here, but it is very clear on page 22, which is 302 of the administrative record, which is the immigration judge decision, he chased after the victim because he was upset from being punched. It seems clear to me that the immigration judge, the agency, understood that this was in response to an aggressive act, and let us not rely, be dismissive of the fact, especially in an astute trial just like yourself, Your Honor, with regard to this individual gave chase. This individual escalated the, criminal law 101, as we all remember, escalated the playing field. He now gave chase, draws his weapon, and then points his weapon in the direction, placing individuals in the imminent apprehension of physical injury, and I think really that is the factor here, and that's the major concern, and looking at... Isn't that what police officers do every day? To arrest people? Yeah. They would draw their gun and they say, freeze, and he was basically making a citizen's arrest, wasn't he? Your Honor, we cannot, I cannot condone this court taking us in the direction of vigilante-type justice with regard to this particular individual. There was the threat now subsided. He, the threat was gone. He gave chase, and if you look at the facts, and now in conducting that review under Frantescu and Konu, as this court may, this court understands, is that it's no longer just limited to the plea and the colloquy, etc. Now with the circumstances of the offense, you have a video. You have a situation in which... We didn't see the video. I mean, this court did not see the video, right? Your Honor, it's... Apparently, the defendant, Mr. Altiar, never saw the video. He claims he never saw the video. I mean, he claimed he was confronted. I mean, the evidence indicates that he was confronted with the facts of that, initially said, I didn't do anything, and then went, caught misleading, right? This so-called, this individual, this individual they were trying to portray as maybe an upstanding citizen of America, where he was initially, when the authorities, did he say, I'm just trying to do my best. I came to the defense of a woman. He said, I didn't do anything, or words to that effect, but when he's confronted by the video, he says, oh, now maybe I don't remember. So I think we have to really be cautious in what we're trying to do here. We're not trying to engage in a mini trial, and this Ninth Circuit has said time and time again, and I will invite this court's attention to Delgado and Avendano that talk about Frantescu and say, okay, did the agency rely on proper evidence and proper factors? And they are the nature of the conviction, the circumstances and the facts of this conviction, the sentence imposed, which it's clear from the record on page 22, again, of the immigration judge's decision, that he had a relatively modest sentence. That's the immigration judge's determination. That's his language. That's not mine. So he clearly took into account the, and the dangerousness, and I, and going on that on page 22 of his decision, the PSI, the pre-sentence investigation response, response actions, reckless and dangerous, endangered the safety of others, danger to the community, notwithstanding the modest sentence. So again, I would invite this court's attention and understand that we are in a situation which you are looking at whether or not the agency abused its discretion here, went beyond these Frantescu factors, neglected these Frantescu factors for purposes of a particular serious crime. What did the pre-sentence report say about, that the IJA relied on the pre-sentence report? The pre-sentence report had a discussion about Mr. Altea also kicking? Yeah. Oh, he, what the pre-sentence investigation revealed, and I think this was also confirmed in the video surveillance, is that once that, once this particular individual was restrained, handcuffed, he went ahead and he was kicked by petitioner after being handcuffed. Again, again, we're in a situation which we are, we are not, we are a nation of laws, not of men. We're not a situation where we can just allow individuals, even though it's a lawfully owned firearm, to grab their firearm and then to go ahead and, and, and give chase when the, that threat subsided, right? From criminal law 101, that threat now subsided, but that individual not only saw fit to give chase, but saw fit to wield a weapon and wield a weapon in the direction of individuals. I think that based upon this, which I will say, and I've had trouble with immigration judges' decisions in the past, and I recognize this court has, that this immigration judge and the board affirming the immigration judge's particular serious crime determination, the immigration judge did a very good job in understanding Frantescu factors and going through the evidence and the circumstances of those, of that offense to, to make that determination that this intentional aggravated assault with a dangerous weapon under 13-1203A2 and 1204A2 was a particular serious crime. And as a result of that particular serious crime, under the statute, INA 208, petitioner is ineligible for relief in the forms of asylum, in the form of withholding of removal, and in the form of withholding of removal under the Convention Against Torture. And the only remaining issue or application for protection, not relief, because Convention Against Torture is considered protection and not relief, would be deferral of removal. This court applies a substantial evidence standard, whether the, the, the evidence compels a contrary conclusion. And I think it's clear, and I think Judge Wallace had indicated previously today in this courtroom, is that with regard to generalities, is we have a nation, Iraq, that has general criminal lawlessness, tribalism, general strife. There is nothing in the record to suggest this individual would be tortured by or with the acquiescence or the, including the concept of willful, not just blindness, willful blindness by the Iraqi government. There's simply no evidence of that whatsoever. There's evidence of tribalism and general criminal strife. And there's also evidence that I've cited in my record at, at my brief at page 47, is that the government of Iraq is actually taking steps to combat that tribalism that is instigated by Daesh or ISIL or ISIS, depending upon your vernacular for that particular, those particular topics. And then lastly, I would say with, if, if there are no questions with regard specifically to the Convention Against Torture aspect and the evidence, I think it's, it's, I think the agency's decision is clear. It's substantial evidence supports the decision by the agency that he failed to qualify for deferral of removal against the Convention Against Torture. Deferral and withholding of removal in the Convention Against Torture are sort of two different forms of relief. A little bit complicated, I know, but sort of the same, but different. And lastly, and the last remaining issue really is, is the motion to reopen. And again, before we get there, what are we looking at for the purposes of this motion to reopen? Is whether or not the board abused its discretion. And all the petitioner tried to do was, in fact, exactly what Petitioner's Council is trying to do today, paint a better picture of himself. But that's not the purpose of the motion to reopen. What changed? What was different? What was different? And there really wasn't anything. And at the end of the day, Your Honors, and I understand Your Honor's concern with the equities present here. We are a nation of laws and not of men. And under the law, this petition for review should be denied in its entirety. And unless there are more questions from the bench, I thank you very much. Thank you, Your Honors. Thank you. Well, I just want to, because we have, we have students out there too. Yes, Your Honor. When you say we're a nation of laws, of course we are. But the laws are applied to people, men, women, children. And the, sending somebody back to their country of origin, who was working as a, like in a dental lab, was, you know, night, working at night in a smoke shop where he'd been robbed. He gets a legal gun. You know, there's human implications of these actions by the federal government that somebody should take a look at and say, yes, we're a nation of laws, but our laws can be applied harshly to individuals. And we all have some discretion in the executive branch to do the right thing. That's all I'm going to say. And I want to say to you, Mr. Leo, you were a wonderful advocate here today and did a great job for your client. Thank you, Your Honor. Thank you, Your Honors. Thank you for your argument. Excuse me? Thank you for your argument. Oh, thank you, sir. Thank you, Your Honor. Are there any particular questions from the court? If not, I'd like to address the last part of counsel's arguments, and that would be the CAD analysis and the motion to reopen. The torture of prominent Sunnis is well documented. I'll just point to AR-1011. When the government fell, the former Sunni minority became the target of, Shia retribution, and not just thugs on the street. The Shia warlord machinery was backed and directly supported by Iraqi members of parliament. It's also in the record. The current prime minister of Iraq was a former member of the Supreme Islamic Iraqi Council, which was backed by the al-Badr Shia Brigade. This is in the record? That last point, no, but that's part of kind of... Excuse me, I didn't see that in the record. No, it's not in the record, Your Honor, because... What we do is we have a record, and then we apply the law to the record. Court can also... That counsel happens to know other facts or has read a book or whatever isn't going to help us. What does the record show? Does the record show that if he is returned, that the government will torture him or will stand aside? So where in the record do I look to see that evidence? You see it in the report by the Army War College Press regarding the Shia militias, okay? Where in the record is that? Again, that's 1011, that's where we start out with it. And then... 1011. Yeah, AR-1011. That's just kind of the highlights, the evidence. Okay, and if I read that record, it'll show that if he's returned, the government, not other policies or policies, will torture him or will stand by while he is tortured. Judge, it shows that the Iraqi Shia militias and government are intertwined, and because they are so intertwined, when it's the Shia militias that are... And the record shows that. Yes. And how does that come? What is in the record? Is it evidence? Is it country condition report? What is it, if I look at 10 and 11 of the record? It's country conditions report, specifically published by the Army War College. They did a very... Is the Army War... Is the Army record... Army War College, those are lectures that happen. I've been to those. Yes. That's not a government record, that's lectures that you hear. Well, I'm looking for some basis upon which to base your argument, and we have to find some record. That the government will torture or will stand by while he's been tortured. What happened at the government... At the War College, is that going to help me? It is, because it's very, very clear through... By whom? That study, among others, even some of the other country conditions reports, that the Shia militias are backed by... You don't have to repeat it, and I understand what's going on, but I'm trying to find the record. That's what we have to go by, not by what I read in the papers or what evidence I have. In the Army War College, did the government, our government, adopt that, and it's a government report? That I don't know for certain, but certainly neither the Department of Homeland Security, the IAJ, nor the BIA called this credibility into question. It was admitted as an exhibit. We have country reports that come out, and the State Department puts them out. That's usually what we see. I've never heard anything from the Army War College being considered as a country report by our government, usually through the State Department. I understand, Your Honor, and when the idea of torture comes up, you're very unlikely to get direct evidence, ever. Well, of course. I understand that, but that isn't the point. The point is you have to show something, and we've outlined pretty well what you have to show. Such as your house being shot up, you're being shot at in your vehicle while you're driving, and that constitutes torture, doesn't it? So that's happened to my client. Okay. Thank you, counsel. Thanks very much. Thank you. Okay. Thank you, both, for your arguments. The Altiar case is submitted.
judges: Wallace, Bress, Lasnik